1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  QUYEN TRAN,                              No. CIV S-07-1287-CMK-P

12              Petitioner,

13        vs.                              <u>MEMORANDUM OPINION AND ORDER</u>

14  T. FELKER,

15              Respondent.

16  _____/

17              Petitioner, a state prisoner proceeding with counsel, brings this petition for a writ

18  of habeas corpus under 28 U.S.C. § 2254.   Pursuant to the consent of the parties, this case is

19  before the undersigned for final decision.   Pending before the court are the following:

20  petitioner's petition (Doc. 1), respondent's answer (Doc. 17), and petitioner's traverse (Doc. 22).

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

# I. BACKGROUND

## A.   Facts[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> Viewed in the light most favorable to the judgments, the evidence showed that on the evening of April 10, 1998, defendants and two or three companions were shooting pool at Hot Shots Billiards on Arden Way in Sacramento.  Defendants were both members of Insane Viet Boys (IVB), an Asian street gang.  As they were preparing to leave, defendants were involved in a confrontation with members of a rival gang, El Camino Crips (ECC), at the poolhall counter.  When someone in defendants' group identified themselves as IVB, someone in the other group said "fuck IVB," which would have been perceived by a gang member as disrespectful and a challenge.  An off-duty reserve sheriff's deputy, Don Ralls, who was working security at the poolhall, intervened and escorted defendants' group to their car, which belonged to Tran.  As they left the poolhall, a group outside that included ECC members taunted defendants' group. Tran and his group then drove away.
>
> Moments later, Tran returned, pulling into the parking lot.  As Tran drove slowly past the poolhall with the headlights of his car off, Vo fired several shots at the people standing outside.  Southalay Vongesedon, an ECC gang member known as "Nippy," who was standing by one of the doors to the poolhall, was killed when he was struck in the back of the head by a bullet fragment.  Deputy Ralls, who was still outside when the shooting occurred, ran after the car as it left and fired one shot but missed.

## B.   Procedural History

The state court recited the following procedural history:

> Defendants and a third suspect, Tuan Huynh, also an IVB member, were eventually arrested and charged with the first degree murder of Nippy (§ 187, subd. (a)) and assault with a firearm on Deputy Ralls (§ 245, subd. (d)(1)).  For penalty enhancements on the murder, the amended information alleged: (1) defendants were armed with a firearm within the meaning of section 12022, subdivision (a)(1); (2) defendants intentionally and personally discharged a firearm causing great bodily injury to the victim within the meaning of section 12022.53, subdivisions (b) through (l); and (3) defendants acted "for the benefit of, at the direction of, and in association with a criminal street gang, to wit, INSANE VIET BOYS, with

---

[1]     Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

the specific intent to promote, further, and assist in criminal conduct by gang members." The amended information also alleged the "drive-by murder" special circumstance that "[t]he murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person . . . outside the vehicle with the intent to inflict death." (§ 190.2, subd. (a)(21)). As penalty enhancements on the assault, the amended information alleged the same arming enhancement and gang enhancement as alleged for the murder. The amended information also alleged the personal use of a firearm by Vo and Huynh (but not by Tran) within the meaning of section 12022.5, subdivision (a).

The jury found Vo and Tran guilty of both crimes and found all applicable enhancement allegations true as to both defendants. The jury could not reach a verdict as to Huynh, and the court declared a mistrial.

The trial court sentenced Vo to a term of life in prison without the possibility of parole for the murder, with a consecutive term of 25 years to life for the section 12022.53 firearm use enhancement and a further consecutive term of 18 years. The latter term was composed of a three-year term for the gang enhancement on the murder, an upper term of eight years for the assault, a four-year term for the section 12022.5 firearm use enhancement on the assault, and a three-year term for the gang enhancement on the assault. The court also imposed but stayed two one-year terms for the section 12022 arming enhancements on the murder and the assault.

The trial court sentenced Tran to a term of life in prison without the possibility of parole for the murder, with a consecutive term of 25 years to life for the section 12022.53 firearm use enhancement and a further consecutive term of nine years four months. The latter term was composed of a middle term of six years for the assault, a two-year term for the gang enhancement on the assault, and a one-year four-month term for an earlier burglary for which Tran was on probation at the time of the shooting. The court also imposed but stayed two one-year terms for the section 12022 arming enhancements on the murder and the assault and a two-year term for the gang enhancement on the murder.

The California Court of Appeal affirmed the conviction in a reasoned decision issued on August 14, 2003. On November 25, 2003, the California Supreme Court granted direct review but deferred action pending resolution of related issues in another case. On March 2, 2005, the California Supreme Court remanded the matter pursuant to People v. Lopez, 34 Cal.4th 1002 (2005). The Court directed the Court of Appeal to vacate its prior decision and reconsider the case in light of Lopez. On April 19, 2005, the Court of Appeal issued a reasoned decision on remand which affirmed the conviction but modified the sentence as follows:

The judgment is modified by striking the sentences imposed on count two (assault with a firearm) pursuant to subdivision (d)(1) of [California Penal Code] section 245 and substituting, pursuant to

1    subdivision (a)(2) of section 245, a sentence of four years in prison for
     defendant Vo and a sentence of three years in prison for defendant Tran.
2    The judgment is also modified by striking the three-year sentence imposed
     on Vo for the criminal street gang enhancement on count one (murder)
3    under former subdivision (b) of section 186.22 and the two-year sentence
     imposed on Tran for the same enhancement on that count.
4

5    Petitioner sought further review by the California Supreme Court, which dismissed the case on

6    June 28, 2006, pursuant to People v. Shabazz, 38 Cal.4th 55 (2006). Respondent concedes all

7    claims are exhausted.

8

9                              **II.  STANDARDS OF REVIEW**

10            Because this action was filed after April 26, 1996, the provisions of the

11   Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

12   applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

13   (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). The AEDPA

14   does not, however, apply in all circumstances. When it is clear that a state court has not reached

15   the merits of a petitioner's claim, because it was not raised in state court or because the court

16   denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

17   habeas court must review the claim de novo. See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.

18   2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach

19   petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208

20   (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

21   perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

22   evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

23   petition de novo where state court had issued a ruling on the merits of a related claim, but not the

24   claim alleged by petitioner). When the state court does not reach the merits of a claim,

25   "concerns about comity and federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.

26   / / /

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).  Thus, under § 2254(d), federal habeas relief is available where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law.  Under both standards, "clearly established law" means only those holdings of the United States Supreme Court as of the time of the relevant state court decision.  See Carey v. Musladin, 127 S.Ct. 649, 653-54 (2006). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. Jan. 17, 2008) (en banc).

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards.  A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

1    determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040,

2    1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

3    case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

4    is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

5           State court decisions are reviewed under the far more deferential "unreasonable

6    application of" standard where it identifies the correct legal rule from Supreme Court cases, but

7    unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith,

8    123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams,

9    suggested that federal habeas relief may be available under this standard where the state court

10    either unreasonably extends a legal principle to a new context where it should not apply, or

11    unreasonably refuses to extend that principle to a new context where it should apply.  See

12    Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

13    decision is not an "unreasonable application of" controlling law simply because it is an erroneous

14    or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 123 S.Ct.

15    1166, 1175 (2003).  An "unreasonable application of" controlling law cannot necessarily be

16    found even where the federal habeas court concludes that the state court decision is clearly

17    erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear error fails to

18    give proper deference to state courts by conflating error (even clear error) with

19    unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal

20    law, where a state court decision is an "unreasonable application of" controlling law, federal

21    habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn,

22    283 F.3d at 1052 n.6.

23           The "unreasonable application of" standard also applies where the state court

24    denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

25    848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).  Such decisions

26    are considered adjudications on the merits and are, therefore, entitled to deference under the

1  AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

2  The federal habeas court assumes that state court applied the correct law and analyzes whether

3  the state court's summary denial was based on an objectively unreasonable application of that

4  law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

5

6                                    **III.  DISCUSSION**

7          Petitioner raises seven claims:  (1) the evidence was insufficient to support the

8  first degree murder with a drive-by special circumstance conviction; (2) the evidence was

9  insufficient to support the assault with a firearm conviction; (3) the evidence was insufficient to

10  support the gang enhancements for use of a firearm and gang activity; (4) the trial court

11  misinstructed the jury on the requirements to find predicate offenses;[2] (5) the trial court erred in

12  admitting testimony from an expert in gangs; (6) the prosecutor committed misconduct by

13  misdefining the reasonable doubt standard as one based on "common sense"; and (7) the

14  sentence constitutes cruel and unusual punishment.

15      **A.      Sufficiency of the Evidence**

16          When a challenge is brought alleging insufficient evidence, federal habeas corpus

17  relief is available if it is found that, upon the record of evidence adduced at trial, viewed in the

18  light most favorable to the prosecution, no rational trier of fact could have found proof of guilt

19  beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979).[3]  Under Jackson,

20

21          [2]      In the heading for this claim, petitioner asserts that "due process was violated
when the jury was misinstructed on the elements of aider and abettor liability."  However, his
22  argument under this heading focuses on his claim in state court that the court misinstructed on
predicate offenses.

23          [3]      Even though Jackson was decided before AEDPA's effective date, this expression
of the law is valid under AEDPA's standard of federal habeas corpus review.  A state court
24  decision denying relief in the face of a record establishing that no rational jury could have found
proof of guilt beyond a reasonable doubt would be either contrary to or an unreasonable
25  application of the law as outlined in Jackson.  Cf. Bruce v. Terhune, 376 F.3d 950, 959 (denying
habeas relief on sufficiency of the evidence claim under AEDPA standard of review because a
26  rational jury could make the finding at issue).

1    the court must review the entire record when the sufficiency of the evidence is challenged on

2    habeas.  See id.  It is the province of the jury to "resolve conflicts in the testimony, to weigh the

3    evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Id.  "The

4    question is not whether we are personally convinced beyond a reasonable doubt.  It is whether

5    rational jurors could reach the conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d

6    303, 306 (9th Cir. 1991);  see also Herrera v. Collins, 506 U.S. 390, 401-02 (1993).  The federal

7    habeas court determines sufficiency of the evidence in the context of the substantive elements of

8    the criminal offense, as defined by state law.  See Jackson, 443 U.S. at 324 n.16.

9              In this case, petitioner raises three claims based on sufficiency of the evidence:

10   Specifically, he seeks reversal of the first degree murder and assault with a firearm convictions

11   because the evidence was insufficient to establish that he was an aider and abettor who shared

12   co-defendant Vo's specific intent.  He also argues that the enhancements must be set aside

13   because the evidence was insufficient to show proof of the two requisite predicate gang offenses.

14        1.    First Degree Murder

15        Petitioner argues:

16             The evidence presented at trial did not support the jury's verdict
             that co-defendant Vo specifically intended to kill or to inflict death as was
17           required for both the first degree murder conviction and the drive-by
             special circumstance enhancement. (footnote and citations omitted).
18           Furthermore, the evidence did not support the verdict that Petitioner aided
             and abetted this crime where there was no evidence that Petitioner had
19           knowledge of Vo's intentions nor any evidence that Petitioner shared an
             intent to kill or to inflict death with Vo.
20             The physical evidence and witness accounts were inconsistent with
             the finding that Vo intended to kill or to inflict death upon the group
21           standing on the sidewalk.

22   At this point, petitioner adds a footnote as follows:

23             The accounts of [Sacramento Bad Boys ("SBB") gang] members
             [Martha] Jackson and [Eli] Orta were so inherently incredible and contrary
24           to the physical evidence and actual witness accounts, their testimony was
             rendered valueless.  As the California Supreme Court explained in *People*
25           *v. Headlee,* 18 Cal.3d 266 (1941), "[w]here ... the evidence relied on by
             the prosecution is so improbable as to be incredible, and amounts to no
26           evidence, a question of law is presented which authorizes an appellate

8

court to set aside a conviction." (*Headlee, supra,* 18 Cal.3d at p. 267). *Headlee* explained that testimony which is improbable on its face is not substantial evidence to support a conviction. (*Id.* at 268). To be improbable on its face, the evidence must assert that something has occurred that it does not seem possible could have occurred under the circumstances disclosed. (*Ibid*). Even were the testimony considered credible, it could not change the physical evidence which demonstrated that shots were not fired at the crowd or the side of the building.

He continues by arguing:

. . . Although numerous shots were fired, there was no evidence of a shooting. Apart from an adventitious bullet strike on Vondesedone, who was struck with a ricocheted bullet, there was no evidence that a shooting took place. The 30 or more people standing in front of a glass-sided building on the sidewalk were sitting ducks for a shooter who actually intended to kill. Instead, none of these individuals were struck, nor was the building struck. It was an irrational inference that Vo intended to kill Vondesedone with a ricocheted bullet. It simply was not possible for him to direct the bullet in the random path it took upon bouncing off another surface.

Furthermore, in order to be convicted of aiding and abetting murder, the evidence needed to support a finding that Petitioner, as "an aider and abettor act[ed] with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman,* 35 Cal.3d 547, 560 (1984)). "[T]he aider and abettor must share the specific intent of the perpetrator. . . [A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*Ibid*). Additionally, an aider and abettor's "intent to encourage or facilitate the actions of the perpetrator 'must be formed prior to or during the commission. of that offense.'" (*People v. Montoya,* 7 Cal.4th 1027, 1039 (1994)). The aider's knowledge and intent to kill cannot be formed after the commission because, "it is both legally and logically impossible to form both the requisite intent and in fact aid, promote, encourage, or facilitate commission of a crime after the commission of that crime has ended." (*People v. Cooper*, 53 Cal.3d 1158, 1164 (1991)). A person who aids the perpetrator's escape, but does not otherwise aid or intend to aid the commission of the crime, is an accessory after the fact and not an aider and abettor. (*Id.* at 1168; *People v. Montoya, supra,* 7 Cal.4th at 1039).

Here, it was not possible for Petitioner to intend the random course that the ricocheted bullet took. The physical evidence demonstrated that the side of the building where dozens of people were standing was not the object of the shooter's intentions. The jury's verdict finding that the shooter specifically intended to kill Vondesedone or inflict death on any other person was not rationally founded in the evidence. The state Court of Appeal unreasonably applied the *Jackson* standard in affirming Petitioner's conviction.

1    As to this claim, the state court held:

2    Defendants contend there was insufficient evidence to support a
     finding that the murder of Nippy was committed with an intent to kill and
3    therefore their convictions for first degree murder must be reversed. We
     disagree.
4

5    The court then outlined the standard under <u>Jackson</u> for reviewing claims of insufficient evidence,

6    and continued its analysis by first addressing, in general, whether there was sufficient evidence to

7    support the jury's conclusion that Vo had the necessary intent for murder:

8    Defendants contend the evidence was insufficient to prove they had
     the intent to kill Nippy because Nippy was killed by a ricochet bullet.
9    According to Vo, "the mere fact of shooting a gun from a car . . . where
     the only person hit was hit by a ricochet, does not in itself prove intent to
10   kill. Neither does the fact that the alleged shooters were gang members
     change that equation."
11   "Intent is a state of mind. A defendant's state of mind must, in the
     absence of the defendant's own statements, be established by the
12   circumstances surrounding the commission of the offense." (citation
     omitted). A defendant's intent to kill may be established by evidence of
13   the defendant's actions before the killing (planning evidence), evidence of
     the defendant's prior relationship or conduct with the victim (motive
14   evidence) or evidence of the nature of the killing (manner evidence).
     (citations omitted).
15   Here, there was evidence of all three types sufficient to support a
     finding of intent to kill. There was evidence that defendants, both
16   members of the IVB gang, had a confrontation with rival gang members in
     a poolhall in which the rival gang showed them disrespect and challenged
17   them. Defendants were escorted from the poolhall by a sheriff's deputy
     while the rival gang returned to the poolhall. As Tran drove the car slowly
18   through the parking lot adjacent to the poolhall with the headlights off, Vo
     pointed a gun toward the crowd standing outside, which included members
19   of the rival gang that had disrespected them, and fired it several times.
     Based on this evidence, the jury could have reasonably found that
20   defendants acted with an intent to kill.
     That Nippy may have been hit by a ricochet bullet does not compel
21   a different conclusion. The pathologist who testified that the bullet which
     hit Nippy was "flying sideways" offered several possible explanations for
22   that fact, only one of which was that the bullet ricocheted. The pathologist
     also said the sideways flight of the bullet could have been caused by "a
23   weapon in a very poor condition with a rifling in the barrel [that] has either
     rusted away or worn away" or "putting an improper caliber ammunition in
24   a weapon and firing it." Even if the bullet did ricochet, that does not, as a
     matter of law, preclude a finding of intent to kill. While a ricochet might
25   have been indicative of the fact that Vo was not firing at the crowd, that is
     not the only possible explanation. As Vo's attorney conceded in his
26   argument to the jury, a ricochet might just as well have resulted from the

10

fact that "[w]hoever pulled in to [*sic*] that parking lot . . . couldn't hit the broad side of a barn."  That a person is a bad shot does not negate the existence of an intent to kill.

The court then considered petitioner specific argument concerning shared intent and aiding and abetting Vo:

> For his part, Tran contends "there was no evidence that he knew of Vo's intention to discharge a weapon" and therefore "no evidence that [Tran] shared the requisite 'intent to kill.'"  We reject this argument also.
>
> "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." ([California Penal Code] § 31).  "Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts."  (citation omitted).  Generally, in the case of murder, "the aider and abettor must know and share the murderous intent of the actual perpetrator" to be guilty of the murder.  (footnote and citation omitted).
>
> The question here is whether there was sufficient evidence to support a finding that Tran shared Vo's intent to kill when Tran drove his car back through the Hot Shots parking lot. Tran contends there was no evidence he was involved in the confrontation inside Hot Shots and "no evidence as to what happened and what was discussed or decided inside the shooter's car prior to the shooting."  While it is true no one testified specifically that Tran was involved in the confrontation inside the poolhall, there was evidence that the group of IVB members escorted from the poolhall got into Tran's car, and Tran was driving the car when it returned to the poolhall a few minutes later.  Thus, there was sufficient circumstantial evidence to find Tran was one of the IVB gang members involved in the confrontation that led to the shooting.  Additionally, while there was no direct evidence of what happened inside the car between the time it left the parking lot and the time it returned a few moments later, that absence of direct evidence does not preclude a finding that Tran shared Vo's murderous intent.  There was evidence that only minutes after being escorted from the poolhall to avoid a gang fight, Tran drove back to the poolhall and drove his car slowly through the parking lot adjacent to the poolhall with the headlights off while Vo pointed a gun out the window and fired at the crowd that included members of the rival gang that had disrespected and challenged them.  The jury reasonably could have inferred from this evidence that Tran drove slowly past the crowd to facilitate Vo's ability to take aim at a rival gang member and that he drove with the headlights off to draw less attention to the car.
>
> Under these circumstance, we conclude a reasonable trier of fact could find beyond a reasonable doubt that Tran shared Vo's intent to kill.  Therefore the evidence was sufficient to support both defendants' convictions for first degree murder.

/ / /

/ / /

1        There are two components to petitioner's claim.  First is whether the evidence was

2   sufficient to establish that Vo intended to kill the victim.  Second is whether the evidence was

3   sufficient to prove that such intent, if it existed, was shared by petitioner.  As to both questions,

4   the state court answered in the affirmative.  This court finds that the state court's determination

5   was neither contrary to not an unreasonable application of clearly established law.  As to the first

6   component of the claim – whether Vo had the requisite intent to kill – the court agrees with the

7   state court that the mere fact that the victim was killed by a ricochet bullet does not negate intent.

8   As Vo's counsel admitted at trial, the ricochet could have indicated only that Vo was a bad shot.

9   In other words, it does not necessarily indicate that Vo did not intend to kill Nippy.  It is possible

10  that Vo did intend to kill Nippy and he missed but ultimately succeeded because the bullet

11  ricocheted and hit Nippy.  It is also possible that the path of the bullet that killed Nippy was the

12  result of a ricochet.  As the pathologist testified, the path could be explained by a poorly

13  maintained gun or the wrong caliber ammunition.

14       In addition to this are the following facts:  (1) Nippy was a member of the rival

15  ECC street gang; (2) there had been a confrontation between IVB members and ECC members

16  before the shooting; (3) petitioner and Vo were escorted out of the poolhall with those who had

17  been engaged in the confrontation; and (4) Vo and petitioner returned following the

18  confrontation, with petitioner driving slowly in the dark with his headlights off, and Vo firing

19  shots from the open window.  Viewed in the light most favorable to the prosecution, as this court

20  must, the evidence was sufficient for a rational jury to conclude that Vo intended to kill Nippy.

21  As the state court noted, under California law intent can be shown by evidence of planning,

22  motive, and manner.  See People v. Anderson, 70 Cal.2d 15, 25, 26-27 (1968).  The intent

23  required for first degree murder is shown when there is evidence of all three types and or at least

24  extremely strong evidence of planning or evidence of motive in conjunction with either planning

25  or manner.  See id.  Here, the rivalry between the two gangs certainly was evidence of motive.

26  Petitioner's act of diving past ECC members slowly with the headlights off while Vo was in

possession of a gun certainly is evidence of planning.  Thus, there was at a minimum strong

evidence of planning as well as evidence of motive in conjunction with planning, satisfying two

of the four possible formulae for establishing intent.

The next question is whether the evidence was sufficient for the jury to find that

petitioner shared Vo's criminal intent.  Again, the court agrees with the state court that it was.

Particularly persuasive is evidence that, even though it was dark outside, petitioner drove Vo

back to the poolhall with the headlights out.  The jury could reasonably conclude from this that

Vo and petitioner were attempting to avoid detection in order to maximize their chances for a

successful "hit."  Furthermore, because Nippy was a member of a rival gang with which

petitioner's gang had recently had a confrontation, the jury could conclude that petitioner brought

Vo back to the poolhall with the intent of killing a rival gang member.

2.      Assault with a Firearm

Petitioner argues:

The elements of assault with a deadly weapon under California law
are well established:

All that is required to sustain a conviction of assault with a deadly
weapon is proof that there was an assault, that it was with a deadly
weapon, and that the defendant intended to commit a violent injury
on another.' (*People v. Lee,* 28 Cal.App.4th 1724, 1734 (1994)).

As the California Supreme Court explained, the *mens rea* for assault is
willfully committing an attempted battery:

The *mens rea* is established upon proof the defendant willfully
committed an act that by its nature will probably and directly result
in injury to another, i.e., a battery. Although the defendant must
intentionally engage in conduct that will likely produce injurious
consequences, the prosecution need not prove a specific intent to
inflict a particular harm. (*People v. Colantuono,* 7 Cal.4th 206,
214-215 (1994)).

As was discussed . . .above . . . when it is alleged that a person, "aided and
abetted" a crime such as an assault, the prosecution must prove the abettor
had prior knowledge of the perpetrator's criminal purpose and that the
abettor shared in the perpetrator's intent.  Although the crime of assault
was a general intent crime, the proof against Petitioner, who was
prosecuted as an aider and abettor necessarily required proof of knowledge

and shared intent to assault.  At trial, the prosecution failed to present any evidence that Don Ralls was assaulted.

The Ralls statements never indicated that Ralls saw a gun or that the gun was ever pointed in his direction. To the contrary, Ralls recounted that he ran alongside the car chasing it and ultimately firing upon the offender's car.  The evidence affirmatively demonstrated that Ralls was not in the line of fire.  It was irrational for the jury to find an assault was committed on Ralls.  Further, it was unreasonable for the Court of Appeal to affirm the verdict in applying the *Jackson* standard for review.

The state court first addressed whether there was evidence that Ralls was assaulted:

Defendants contend there was insufficient evidence of an assault on Deputy Ralls because "there was no evidence that any of the defendants specifically pointed a gun or fired at Ralls during the entire encounter." We conclude the evidence was sufficient to support defendants' convictions for assault with a firearm.

* * *

. . . [F]or the assault convictions to stand in this case, there must be substantial evidence that Ralls was among those persons whom it was reasonably foreseeable could have been injured by the shots Vo fired from Tran's car.  Defendants contend "the evidence does not establish that Ralls was in the group of people toward whom the shots were being fired."  The People, on the other hand, contend "the evidence showed Ralls was near enough to the group which was fired upon to be within range of being hit, so the evidence was sufficient to support the verdict."

The evidence showed there were two doors along the west side of the poolhall where the shooting occurred.  Nippy was standing with a group near the southernmost door when he was shot, and there was testimony that shots were fired toward that group.  In addition, a bullet fragment was found inside the poolhall near that door.

There was other evidence, however, that the shooting was not limited to the vicinity of the southernmost door.  One witness testified the shooter was pointing his gun toward the nothernmost door.  Furthermore, the only possible impact mark found on the west side of the poolhall was on the wall at a spot much closer to the northernmost door than the southernmost door.

In two statements he gave shortly after the shooting, Deputy Ralls said he was standing on the sidewalk along the west side of the poolhall, near the northernmost door, talking with 10 or so members of the group that had confronted defendants, when he heard  the sound of gunshots.  He turned and saw the car that had left moments before down near the southernmost door.  Deputy Ralls started running south along the sidewalk as the car moved north.  As he drew even with the car, then turned and began running parallel to the car down the sidewalk, he continued to hear gunshots.  Deputy Ralls specifically stated in his tape-recorded statement that shots were fired as he was running "parallel to the car."

14

* * *

Given the evidence of shots fired in the direction of both doors on the west side of the poolhall, the evidence that the shots were fired from a car moving south to north, and the evidence that Deputy Ralls himself was moving parallel to the car as shots were fired, we cannot say under any hypothesis whatever that there is insufficient substantial evidence to support the jury's implicit determination that Deputy Ralls was among those person whom it was reasonably foreseeable could have been injured by the shots Vo fired from Tran's car.

The court then addressed petitioner's more specific argument concerning shared intent:

For his own part, Tran renews the argument he made in connection with the murder charge that there was insufficient evidence that he "had knowledge of co-defendant Vo's criminal purpose prior to or during the commission of the crime." We disagree. Because assault is not a specific intent crime (citation omitted), Tran did not have to share a specific intent to assault Deputy Ralls to be held liable for assault as an aider and abettor. (citation omitted). Instead, Tran simply must have acted with knowledge of Vo's criminal purpose and with the purpose of committing or of encouraging or facilitating commission of the offense. (citation omitted).

Here, the evidence showed that following an altercation with rival gang members in which his gang was shown disrespect, Tran drove back to Hot Shots moments later and cruised slowly through the parking lot with the headlights of his car off while Vo fired several shorts out the window toward the people outside the poolhall, including Deputy Ralls. This evidence was sufficient to support a finding by the jury that Tran knew Vo intended to shoot at people outside Hot Shots and by driving the vehicle with the purpose of facilitating the shooting. Accordingly, there was sufficient evidence to support both defendants' convictions for assault with a firearm.

The essence of petitioner's argument is that the prosecution did not present any evidence to establish the necessarily elements of assault and, even if it did, petitioner did not share the necessary intent with Vo. Again, this court agrees with the Court of Appeal's analysis. As to whether there was sufficient evidence of an assault on Ralls, the record demonstrates that Ralls was close to the group of ECC gang members who were the subject of the drive-by shooting. In particular, Ralls testified that he was standing outside the poolhall talking with ECC members when the shooting occurred. Ralls also testified that shots were fired while he was running parallel to the car. Therefore, as the state court concluded, the evidence supported the jury's conclusion that Ralls was among those "whom it was reasonably foreseeable could have

been injured by the shots Vo fired from Tran's car."  For the reasons discussed above, the

evidence was also sufficient to establish that petitioner aided and abetted Vo's assault on Ralls.

Therefore, the state court's denial of this claim was neither contrary to nor an unreasonable

application of the law.

### 3.   Enhancements

Petitioner contends that there was insufficient evidence to support enhancements

for gun use and gang activity because the prosecution only presented evidence as to one of the

two predicate offenses required for both enhancements.  Specifically, petitioner argues:

> Petitioner was charged and convicted of two gang enhancements
> which substantially lengthened his sentence.  Firstly, on the assault charge,
> it was alleged that the crime was committed to benefit a criminal street
> gang in violation of California Penal Code § 186.22.  The true finding
> increased Petitioner's sentence on this offense by two years.  On the
> murder charge, it was alleged that Petitioner personally used a gun in
> violation of California Penal Code, section 12022.53.  This section
> ordinarily would not have applied to Petitioner because he was not accused
> of being a shooter.  (*People v. Bostick,* 46 Cal.App.4th 287, 297 (1996)).
> However, the section provides an exception to this requirement and
> permits its application where a person aids and abets a shooting to benefit
> a criminal street gang.  (footnote omitted).  "[I]n order to find an aider and
> abettor-who is not the shooter-liable under section 12022.53, . . . the
> prosecution must plead and prove that . . . the offense was committed 'for
> the benefit of, at the direction of, or in association with any criminal street
> gang, with the specific intent to promote, further, or assist in any criminal
> conduct by gang members' [within the meaning of §186.22]."  (*People v.
> Garcia,* 28 Cal.4th 1166, 1174 (2002)).  This enhancement imposed a
> mandatory consecutive 25 years to life sentence onto Petitioner's LWOP
> sentence for murder.  Where both of these enhancements increased the
> Petitioner's maximum sentence, the rule of *Apprendi v. New Jersey*, *supra,*
> 530 U.S. at 489, applies.  Thus, these enhancements are to be evaluated
> under the same sufficiency of evidence standard of *Jackson* described
> above. . . .  Like the evaluation of the underlying charges, the Court of
> Appeal's evaluation of the evidence supporting the gang enhancement
> unreasonably applied the *Jackson* standard in affirming the sufficiency of
> evidence.
> The misapplication of the *Jackson* standard was particularly
> egregious in Petitioner's case where a series of two published opinions by
> the Court of Appeal and two grants of review by the California Supreme
> Court effectively assured that Petitioner and his co-defendant would be the
> only California defendants to be subjected to a conviction based on
> insufficient evidence in violation of established California law. Under
> California Supreme Court precedent, the gang enhancement must be based
> on evidence which was conspicuously lacking.

1   Petitioner's arguments as to sufficiency of the evidence for both enhancements are based on his

2   contention there was insufficient proof of two predicate offenses as required by § 186.22.

3   Petitioner concedes that the charged offense can constitute one of the required predicate offenses.

4   He also concedes that the prosecution can rely on evidence of the commission of a second

5   predicate offense by a fellow gang member.  However, petitioner argues that, under California

6   law, a perpetrator and an aider and abettor together commit but one offense.  Thus, he concludes

7   that, because he was charged only as an aider and abettor, the prosecution could only establish

8   the two required predicate offenses by proving that there were two perpetrators – Vo and

9   someone else other than him.

10          As to this claim, the California Court of Appeal began by identifying the issue and

11   outlining the relevant California law:

12          We are concerned with the predicate offenses required to show a
            "pattern of criminal gang activity."  To establish the required pattern, the
13          prosecution must prove that the predicate offenses "were committed on
            separate occasions, or by two or more persons."  (§ 186.22, subd. (e)).
14          "This language allows the prosecution the choice of proving the requisite
            'pattern of criminal gang activity' by evidence of 'two or more' predicate
15          offenses committed 'on separate occasions' or by evidence of such
            offenses committed 'by two or more persons' on the same occasion."
16          (*People v. Loeun* (1997) 17 Cal.4th 1, 10).  "[W]hen the prosecution
            chooses to establish the requisite 'pattern' by evidence of 'two or more'
17          predicate offenses committed on a single occasion by 'two or more
            persons,' it can . . . rely on evidence of the defendant's commission of the
18          charged offense and the contemporaneous commission of a second
            predicate offense by a fellow gang member."  (*Ibid*).  However, proof that
19          one gang member committed a single crime and was aided and abetted in
            the commission of that crime by another gang member establishes only
20          one predicate offense.  (*People v. Zermeno* (1999) 21 Cal.4th 927, 931-
            933).
21          Here, the prosecution relied on the charged offenses of murder and
            assault to serve as the predicate offenses for the gang enhancements.
22          (footnote omitted).  Defendants contend the charged offenses were
            insufficient to establish the requisite predicate offenses under the
23          California Supreme Court's decision in *People v. Zermeno*. . . .  They are
            mistaken.
24          In *Zermeno*, a section 186.22(b) gang enhancement was imposed
            on a defendant who was convicted of assault with a deadly weapon.
25          (citation omitted).  The finding of the requisite predicate offenses was
            based on the assault itself and abetting of the assault by the defendant's
26          fellow gang member.  (citation omitted).  The Supreme Court found the

17

1
2
3
4
5
6
7
8
9
10
11
12

> evidence insufficient to support the gang enhancement. . . . [T]he high court concluded that "under applicable law, the combined activity of defendant and his companion, who facilitated defendant's commission of the assault, was a single offense." (citation omitted).
>
> Relying on *Zermeno*, defendants assert that "for the people to establish that the charged act herein constituted the requisite 'pattern,' the people necessarily had to prove that there were two perpetrators [of the charged offenses] other than . . . Tran," who was only an aider and abettor. Not so.  Under *Zermeno*, proof that a perpetrator and an aider and abettor acted together to commit a single crime establishes only one predicate offense for the purposes of a section 186.22(b) gang enhancement. (citations omitted).  Here, however, there was substantial evidence a perpetrator (Vo, the shooter) and an aider and abettor (Tran, the driver) acted together to commit *two* crimes – the murder of Nippy and the assault on Deputy Ralls.  (emphasis in original).  Thus, there was substantial evidence of two predicate offenses committed by two persons on a single occasion.  There is nothing in section 186.22(b) or *Zermeno* that requires two predicate offenses committed on a single occasion to have two different perpetrators.  All that is required is two or more predicate offenses committed by two or more persons on a single occasion – whether those persons act as perpetrators or as aiders and abettors.
>
> For the foregoing reasons, we conclude the evidence was sufficient to support the gang enhancements.

13 Petitioner contends this analysis is incorrect under California law because the Court of Appeal

14 equated two crimes – murder and assault – with two acts.  In other words, petitioner argues that,

15 because only one event occurred in this case (the shooting which was the basis for both the

16 murder and assault charges), the <u>Zermeno</u> rule applies.  According to petitioner, California law

17 requires predicate offenses to be based on separate crimes arising from separate acts, not separate

18 crimes arising from the same act.

19 Resolution of this claim is simple.  As respondent notes, this court cannot

20 disregard a state court's determination of state law.  A writ of habeas corpus is available under 28

21 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts.  <u>See</u>

22 <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195,

23 1197 (9th Cir. 1983).  It is not available for alleged error in the interpretation or application of

24 state law.  <u>Middleton</u>, 768 F.2d at 1085; <u>see also</u> <u>Lincoln v. Sunn</u>, 807 F.2d 805, 814 (9th Cir.

25 1987); <u>Givens v. Housewright</u>, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be

26 utilized to try state issues de novo.  <u>See</u> <u>Milton v. Wainwright</u>, 407 U.S. 371, 377 (1972).

1    In the context of petitioner's sufficiency of the evidence claim, the issue is

2    whether, under state law, the evidence was sufficient to establish the elements of the crime.  As

3    discussed above, the court finds that the evidence was sufficient to establish petitioner's guilt on

4    both the murder and assault charges.  Therefore, the only question is whether, as a matter of state

5    law, the murder and assault in this case – which arose from the same act – can constitute the

6    required predicate offenses.   Here, the Court of Appeal has held that, under California law, two

7    predicate offenses occurring on the same occasion – even if they are based, as here, on a single

8    act – are sufficient for a § 186.22 enhancement.[4]

9    Further, even if this court could reach the question whether the Court of Appeal

10   properly applied Zermeno or Loeun, the court finds nothing in those decisions which precludes

11   the Court of Appeal's interpretation and application of § 186.22 in this case.  In Zermeno, the

12   California Supreme Court concluded that the enhancement did not apply because the defendant

13   and perpetrator committed the single crime of assault with a deadly weapon.  See Zermeno, 21

14   Cal.4th at 931-32.  In this case, petitioner aided and abetted in two crimes – murder and assault.

15   In Loeun, the California Supreme Court held that § 186.22 can be based on two offenses

16   committed on "a single occasion" and can be based on the defendant's commission of the

17   charged offense and the "contemporaneous" commission of a second predicate offense by a

18   fellow gang member.  Loeun, 17 Cal.4th at 10.  The use of the words "a single occasion" and

19   "contemporaneous" are consistent with the Court of Appeal's application of § 186.22 in this case

20   to two crimes arising from the same act – the single act is the "single occasion" and both the

21   murder and assault were "contemporaneous."  Further, contrary to petitioner's argument, there

22   are two separate gang members who committed two separate crimes – Vo committed first degree

23

24       [4]    The court, therefore, rejects petitioner's contention that the evidence was
         insufficient to prove there were two shooters because Martha Jackson changed her account at
25       trial.  It is clear that the evidence was sufficient to establish that Vo was the shooter, which is all
         that is required because Vo's conduct gave rise to two separate crimes, both of which are
26       predicate offenses under § 186.22.

murder and petitioner aided and abetted in the assault on Ralls (or Vo assaulted Ralls and petitioner aided and abetted in the murder of Nippy).  It does not matter that these crimes occurred at the same time or arose from the same act.  All that is required is that there were two crimes – murder and assault – committed by at least two gang members – Vo and petitioner.

　　　　For these reasons, the court finds that the state court's resolution of this claim was neither contrary to nor an unreasonable application of Jackson to California law.

　　　**B.**　**Instructional Error**

　　　　A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not available for alleged error in the interpretation or application of state law.  See Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).  Thus, a challenge to jury instructions does not generally give rise to a federal constitutional claim.  See Middleton, 768 F.2d at 1085) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

　　　　However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process."  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

/ / /

/ / /

1   In general, to warrant federal habeas relief, a challenged jury instruction "cannot

2   be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

3   process right guaranteed by the fourteenth amendment." Prantil v. California, 843 F.2d 314, 317

4   (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner

5   must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting

6   conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp,

7   414 U.S. at 147).  In making its determination, this court must evaluate an allegedly ambiguous

8   jury instruction "'in the context of the overall charge to the jury as a component of the entire trial

9   process.'" Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

10  1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire

11  'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

12  way' that violates the Constitution." Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494

13  U.S. 370, 380 (1990)).  Petitioner's burden is "especially heavy" when the court fails to give an

14  instruction. Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  Where an instruction is missing a

15  necessary element completely, the "reasonable likelihood" standard does not apply and the court

16  may not ". . . assume that the jurors inferred the missing element from their general experience or

17  from other instructions. . . ." See Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994).  In the

18  case of an instruction which omits a necessary element, constitutional error has occurred.  See id.

19  It is well-established that the burden is on the prosecution to prove each and every

20  element of the crime charged beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 364

21  (1970).  Therefore, due process is violated by jury instructions which use mandatory

22  presumptions to relieve the prosecution's burden of proof on any element of the crime charged.

23  See Francis v. Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510

24  (1979).  A mandatory presumption is one that instructs the jury that it must infer the presumed

25  fact if certain predicate facts are proved. See Francis, 471 U.S. at 314.  On the other hand, a

26  permissive presumption allows, but does not require, the trier of fact to infer an elemental fact

1  from proof of a basic fact.  See County Court of Ulster County v. Allen, 442 U.S. 140, 157

2  (1979).  The ultimate test of the constitutionality of any presumption remains constant –  the

3  instruction must not undermine the factfinder's responsibility at trial, based on evidence adduced

4  by the government, to find the ultimate facts beyond a reasonable doubt.  See id. at 156 (citing In

5  re Winship, 397 U.S. at 364).  Finally, even if constitutional error is found, habeas relief is not

6  warranted if the error was harmless.  See Ho v. Carey, 332 F.3d 587, 592 (9th Cir. 2003); see

7  also Pulido v. Chrones, 487 F.3d 669 (9th Cir. 2007) (en banc), cert. granted, ___ S.Ct. ___,

8  2008 WL 482035 (Feb. 25, 2008).

9         Petitioner argues:

10           In a claim directly related to the sufficiency of the elements of the
    predicate acts to establish the gang enhancement, Petitioner's due process
11    was violated when the jury was misinstructed on the elements of Penal
    Code § 186.22.  The Court of Appeal agreed that the jury was not properly
12    instructed on the offense.  However, the court unreasonably applied the
    Chapman v. California, 386 U.S. 18 (1967), standard of [harmless] error
13    in finding the error harmless.  In direct contradiction to the holdings of
    Loeun and Zermeno, discussed . . . [above], the trial court instructed the
14    jury that it could consider the present offense showing the requisite
    "pattern" of two predicate offenses so long as there were two or more
15    participants. The court failed to advise the jury, as is required by Zermeno,
    that these participants could not be "aiders and abettors."  In pertinent part,
16    the court misinstructed the jury as follows:

17           . . .A pattern can be established by two or more incidents, each
        with a single perpetrator, or by a single incident with multiple
18        participants committing one or more of the specific offenses listed
        above.  The current offenses charging the defendant(s) with assault
19        with a deadly weapon and homicide can be used to establish a
        pattern of criminal gang activity. (RT 1921-1922, (italics added by
20        petitioner)).

21    The Court of Appeal agreed the instruction was erroneous and in violation
    of the rule of Zermeno:
22
23           Under Zermeno, the foregoing instruction was erroneous
        because it informed the jury that a pattern of criminal gang activity
        could be established by "a single incident with multiple
24        participants committing one or more of the specified offenses. . . ."
        (Italics added by petitioner).  As written, the instruction allowed
25        the jury to find a "pattern of criminal gang activity" based on the
        commission of only one offense by multiple participants.  Under
26        Zermeno, however, proof of a single crime establishes only one

                                          22

1           predicate offense, no matter how many aiders and abettors may
2   assist the perpetrator in committing the crime. (Opinion 04-19-2005, pp. 53-54).

3           Despite finding error, the Court of Appeal nevertheless deemed the error
    harmless under the *Chapman* standard. . . .  Here, for the very same
4   reasons that the evidence was insufficient, . . . it is beyond argument that
    the instructional error was not harmless beyond a reasonable doubt.  The
5   aider and abettor limitation went to the heart of the pattern element of the
    criminal gang enhancements.  There was no evidence of a second shooter
6   as had been expected by the prosecution.  The instruction permitted the
    jury to consider Petitioner, an aider and abettor, as the second participant
7   in violation of *Zermeno's* limitation.  The error was not harmless, and it
    was unreasonable for the Court of Appeal to so apply *Chapman*'s
8   [harmless error] standard in this manner.

9   As with petitioner's argument discussed above concerning the sufficiency of the evidence for the

10  enhancements, petitioner's argument here is based on his contention that the prosecution failed to

11  prove there were two shooters.

12          The Court of Appeal, having rejected the "two shooter" argument, concluded that

13  any instructional error was harmless:

14          Under the [federal] standard of harmless error, we must determine
    "whether the prosecution has 'prove[d] beyond a reasonable doubt that the
15  error . . . did not contribute to' the jury's verdict."  (citation omitted).
    Under this standard, we find the instructional error harmless.  The jury
16  convicted both Vo and Tran of having committed both the murder of
    Nippy and the assault with a firearm on Deputy Ralls.  Thus, the jury's
17  verdicts on the charged offenses confirm that the jury found the two
    predicate offenses committed by two persons on a single occasion needed
18  to impose the gang enhancements in this case, despite error in the court's
    instruction that would have allowed the jury to find the enhancement
19  allegation true based on a single predicate offense. . . .

20  The court finds that this logic is unassailable.  Given that California law allows predicate

21  offenses to arise from the same act, the legal premise behind petitioner's argument is absent.

22  Further, as the Court of Appeal noted, the jury convicted on both counts – murder and assault.

23  While petitioner did indeed aid and abet Vo, he did so with respect to two separate crimes, both

24  of which are predicate offenses.  Therefore, even though the erroneous instruction could have

25  allowed the jury to reach the incorrect conclusion that the enhancement could be imposed based

26  on only one predicate offense, that did not happen in this case because the jury found two

1  predicate offenses.  Because any error was harmless, the court finds that the state court's

2  disposition of this claim was neither contrary to nor an unreasonable application of clearly

3  established law.

4       **C.**     **Evidentiary Ruling**

5       As discussed above, a writ of habeas corpus is available under 28 U.S.C. § 2254

6  only on the basis of a transgression of federal law binding on the state courts.  See Middleton,

7  768 F.2d at 1085.   Because federal habeas relief does not lie for state law errors, a state court's

8  evidentiary ruling is grounds for federal habeas relief only if it renders the state proceedings so

9  fundamentally unfair as to violate due process.  See Drayden v. White, 232 F.3d 704, 710 (9th

10  Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926

11  F.2d 918, 919 (9th Cir. 1991); see also Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994).

12  In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have

13  resulted in a complete miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962);

14  Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736

15  (9th Cir. 1960).

16       Petitioner challenges the trial court's ruling allowing expert testimony on gangs.

17  Citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), petitioner argues that

18  ". . . it was not proper for the 'expert' to move beyond describing the general structure of gangs

19  and their culture and habits to the area of gang members' thinking processes."  Petitioner also

20  argues that the expert's testimony violated limits under California law on:  (1) opinion testimony

21  on mental state; (2) evidence of other crimes and bad acts to show propensity; (3) prejudicial

22  evidence; and (4) hearsay.  He further contends that the state court's ruling improperly allowed

23  the jury to find aider and abettor liability through expert testimony.

24  / / /

25  / / /

26  / / /

The Court of Appeal addressed this claim by starting with the factual background:

Before trial, the prosecution filed a motion to introduce into evidence portions of letters written by defendants while in custody. Although the written motion is not part of the record on appeal, the discussion of the motion reveals that the prosecution's purpose in seeking to introduce the letters was not only to prove the gang enhancement allegations, but also to prove "what was going through a gang member's mind as to why they got in an argument at the counter of the pool hall, as to why they would come back and do something like this." The prosecution also expressed its intent to call a gang expert to testify, based in part on the letters, about "what the gang mentality is and how gangs operate and how gang members think" and "why this crime occurred."

Although he said he had "no problem with [the expert], at least at the present time," Vo's counsel did object to introduction of the letters on several grounds, including that they were improper character evidence and were more prejudicial than probative. Tran's counsel said his "position was the same as" that of Vo's counsel. Both attorneys suggested, however, that the expert's testimony would be unnecessary if they stipulated to the elements of the gang enhancement.

Subsequently, Tran's counsel filed a written opposition to the prosecution's "application for use of its 'gang expert' to testify before the jury." Tran argued "it is not necessary to have an expert testify in a simple case where the defense offers to stipulate to what the expert could permissibly testify to. . . .

The trial court stated it was "unpersuaded" by Tran's argument "that a gang expert . . . should not be permitted in this case" and concluded "juries at the minimum need explanations about gang mentality and gang activities and gang methods and morale" "that isn't common knowledge." Accordingly, the trial court denied Tran's "motion to exclude a gang expert or prevent the People from calling a gang expert." With respect to the prosecution's motion to introduce the letters, the trial court stated it was "going to permit . . . the expert to refer to" the letters. The court explained that "most of this has some value and is probative. And I don't think its prejudicial effect is so great as to significantly outweigh the probative value, which I find to be considerable."

It was subsequently agreed that the parties would stipulate before the jury that at the time of the crime, defendants were members of IVB.

In her testimony, the gang expert testified about a "gang mentality." which involves elements of reputation, respect, rivalry, revenge, loyalty, and camaraderie. Among other things, she testified that "failure to get respect requires them to act on it, which allows them to work as a group" and that "when they are shown disrespect they are then required to go out and fix it." She read excerpts from letters written by defendants and explained how those excerpts demonstrated elements of gang mentality. For example, she explained how an excerpt from a letter written by Tran demonstrated "the need to exact revenge. That when you're disrespected and somebody shows you disrespect, you've got to react to that." The prosecution also posed a hypothetical question to the expert based on the evidence of the confrontation at Hot Shots and the subsequent shooting and elicited her opinion that the shooting "occurred

1          for the benefit of, the association of or the direction of IVB members with
2          the specific intent to promote the criminal activity of IVB."

3    The court then considered each of petitioner's specific arguments concerning the gang expert's

4    testimony.

5          1.    Proper Opinion Testimony

6          Petitioner contends:

7               It was unreasonable for the state court of appeal to find that
8          testimony of the expert witness was relevant and qualified as reliable and
           helpful to the jury. . . .

9    Thus, it appears that he argues that the gang expert testimony:  (1) was not relevant; and (2) was

10   not proper because it was not related to a subject significantly beyond jury's common experience.

11   Regarding relevance, the Court of Appeal held:

12               . . . Here, the gang expert's testimony was relevant to prove
           elements of the gang enhancement allegation, e.g., whether the crimes
13         with which defendants were charged were committed "for the benefit of, at
           the direction of, or in association with any criminal street gang, with the
14         specific intent to promote, further, or assist in any criminal conduct by
           gang member."  (citations omitted).  The gang expert's testimony was also
15         relevant to prove defendants had a motive for committing the drive-by
           shooting at Hot Shots.  Proof of motive, in turn, was relevant to prove both
16         identity and intent.  As the gang expert explained in response to the
           hypothetical question based on the facts of the shooting:  "IVB is
17         confronted by ECC and they are shown that disrespect by being cussed at
           and said you're not anybody, we don't – we don't even want to
18         acknowledge who you are because you're so insignificant, that act of
           disrespect with IVB coming back saying okay, we'll show you who's
19         nobody.  We're gonna shoot you.  We're gonna come back and do that."

20   While petitioner contends that the testimony was not relevant, he does not present any specific

21   arguments concerning this discussion by the Court of Appeal.  Rather, petitioner's assertions

22   focus on whether the testimony was reliable evidence and whether it was the proper subject of

23   expert testimony.[5]

24   _____

25         [5]    To the extent petitioner contends under <u>Daubert</u> that the gang expert's testimony
     failed to meet the threshold of reliability for scientific evidence, <u>Daubert</u> is inapplicable here
26   because there is no suggestion that the gang expert's testimony was based on any scientific
     technique.

1    As to whether the testimony was properly the subject of expert testimony, the state

2    court concluded:

3    Tran contends the trial court erred in allowing the gang expert to
     testify because none of the gang expert's testimony "met the standard of

4    'beyond the common experience' standard . . . required for expert
     witnesses."  According to Tran, "[t]he concept of 'gang mentality' is as

5    old as human history" and is "commonly understood in our culture."
     Again, we find no error.

6                                              * * *

7

8    We find no clear abuse of discretion in the trial court's
     determination that "gang mentality and gang activities and gang methods

9    and morale" are not "common knowledge."  "[T]he decisive consideration
     in determining the admissibility of expert opinion evidence is whether the

10   subject of inquiry is one of such common knowledge that men of ordinary
     education could reach a conclusion as intelligently as the witness or

11   whether, on the other hand, the matter is sufficiently beyond common
     experience that the opinion of an expert would assist the trier of fact."

12   (citation omitted).  Here, the trial court reasonably concluded that the way
     gang members tend to think and act is sufficiently beyond common

13   experience that the opinion of an  expert would assist the trier of fact.
     That gang violence is "repeatedly portrayed" in the media does not mean a

14   gang expert could not be of assistance to the jury in understanding gang
     culture.  Indeed our Supreme Court has held that expert opinion testimony

15   is admissible on "[t]he subject matter of the culture and habits of criminal
     street gangs."  (citation omitted).

16   As the state court observed, under California law, gang culture is the proper subject of expert

17   testimony.[6]  Petitioner's arguments that the expert's testimony was unreliable because it was

18   "juvenile" and not supported by any explanation does not go to admissibility but to weight,

19   which is not an issue this court can address on habeas review.  The court finds that the Court of

20   Appeal's determination was neither contrary to nor an unreasonable application of the law.

21   / / /

22   / / /

23

24          [6]    Petitioner's contention that the testimony would not be admissible under the
     Federal Rules of Evidence has no bearing on whether, under California law, experts may testify

25   on criminal street gang culture.  Further, this contention is based on Daubert's test for reliability
     of scientific evidence and is inapplicable because the gang expert's testimony was not based on

26   any scientific techniques.

2.   Opinion on Mental State

As to this contention, the Court of Appeal stated:

> Tran next contends the gang expert's testimony was inadmissible because it "impermissibly went to [Tran's] ultimate mental state." Specifically, Tran complains of the expert's expression of her opinion that the shooting was committed "for the benefit of, the association of, or the direction of IVB members with the specific intent to promote the criminal activity of IVB." Tran contends this testimony was prohibited by [California Penal Code] section 29, which he claims prohibits an expert from testifying that a defendant had or did not have a particular mental state. That statute is irrelevant, however, because by its plain terms it applies only to an expert "testifying about a defendant's mental illness, mental disorder, or mental defect." (citation omitted). The gang expert here was not testifying about defendants' mental illness, disorder, or defect; she was testifying about defendants' motive for committing the drive-by shooting. Thus, section 29 does not apply.

By its plain language, the state court ruled entirely based on state law principles. Specifically, petitioner's argument under California Penal Code § 29 was inapplicable and did not warrant reversal. Petitioner attempts to avoid the purely state law aspect of this claim by arguing to this court that the gang expert's testimony violated his due process right of "requiring the prosecution to prove the element of specific intent." The court is not persuaded. The phrase "specific intent" as used in the gang enhancement statute, as well as the expert's testimony, does not refer to the kind of mens rea required to prove guilt on the underlying offenses of murder and assault with a deadly weapon. Rather, the phrase is used to mean the same as "for the purpose of." In other words, the question under the gang enhancement statute is not the criminal mental state of the defendant, but the purpose of the predicate offense.

The court finds that petitioner's argument, to the extent it challenges the Court of Appeal's holding that § 29 is inapplicable, does not present a cognizable federal habeas claim. The court also finds that, to the extent petitioner raises a due process claim, no violation of due process occurred. Therefore, the state court's determination of this aspect of petitioner's claim relating to the gang expert testimony was neither contrary to nor an unreasonable application of clearly established law.

3.     Propensity

Petitioner challenges the letters which the gang expert considered and on which she commented during the course of her testimony.  Specifically, petitioner contends:

> In addition to the overbroad, unreliable "gang mentality" and ultimate mental state evidence, the court allowed the prosecution to present impermissible "propensity" evidence by way of the expert witness testimony.  In the context of rendering her expert opinion, the expert read several letters written by Petitioner and his co-defendants.  These letters recounted other bad acts that were completely unrelated to the charged crimes.

As to this claim, the Court of Appeal stated:

> Defendants next contend the excerpts from the letters constituted inadmissible character evidence showing only their "propensity to commit a violent act."  Again, we disagree.  While it is true that, generally, evidence of specific instances of a defendant's conduct "is inadmissible when offered to prove his or her conduct on a specified occasion" (citation omitted), this bar on specific acts evidence does not apply when the evidence is "relevant to prove some facts (such as motive, . . . intent, [or] identity, . . .) other than his or her disposition to commit such an act" (citation omitted).  As we have explained already, the excerpts from the letters were a vital part of the gang expert's testimony in this case, which tended to show that defendants, as gang members, exhibited elements of the "gang mentality" and thus had motive to commit the drive-by shooting at Hot Shots, which in turn tended to prove both identity and intent.  Thus, the excerpts from the letters did far more than prove defendants had a propensity for violence. . . .

Petitioner does not address the state court's analysis in his petition other than by offering the conclusory statement that "[i]t was unreasonable for the Court of Appeal to approve of the admission of other bad acts evidence."  In particular, petitioner does not explain why the state court's analysis was unreasonable, and this court cannot find any reason to conclude that it was. As the Court of Appeal noted, the letters were relevant to show motive, identity, and intent. Regarding the letters, the state court observed:

> For example, the prosecution asked the gang expert about an excerpt from a letter in which Vo had written:  "So who do you fight with? I now there's hella enemies in J-1.  I'd be fighting all day if I was over there.  I can't wait to see one of the enemies."  The gang expert then testified that this letter reflected upon the gang mentality by showing "[r]ivalry.  Again, establishing who his enemies are.  They have enemies. Gangsters have enemies.  They want respect.  If somebody disrespects

1    then, they're going to confront.  They want notoriety.  If they want
2    notoriety they'll just pick the fight because they want notoriety.  They want
     people to know who they are and how bad they are.  They're bullies."  [¶]
     The specific excerpts from defendants' letters allowed the gang expert to
3    tie her general testimony about gang mentality to these defendants in
     particular by showing that these individuals exhibited elements of gang
4    mentality, which in turn bolstered the inferential showing that the
     confrontation at Hot Shots gave defendants motive to commit the drive-by
5    shooting with the intent to kill, as well as the purpose required to prove the
     gang enhancement allegation. . . .

6

7    The court finds that petitioner has failed to meet his burden of establishing that the state court's

8    determination of this claim was either contrary to or an unreasonable application of clearly

9    established law.

10              4.      Prejudicial Effect

11   Petitioner argues:

12           At trial, the defendants argued that the nature and scope of the gang
     expert testimony proposed was too prejudicial in violation of California
13   Evidence Code § 352.

14           The court in its discretion may exclude evidence if its probative
     value is substantially outweighed by the probability that its
15   admission will . . . create a substantial danger of undue prejudice.
     (Cal. Evid. Code § 352).
16

17   As the California Supreme Court has explained,

18           When a § 352 objection is raised by a party, the trial court "must
     weigh the admission of the [challenged] evidence carefully in
19   terms of whether the probative value of the evidence is greater than
     the potentially prejudicial effect its admission would have on the
     defense." [Citation.].  If the prejudicial effect outweighs the
20   probative value, the trial court should exclude the evidence.
     "[T]he fundamental rule [is] that relevant evidence whose
21   probative value is outweighed by its prejudicial effect should not
     be included." [Citation]. . . .
22

23           The people did not have a right to present evidence which was
     highly prejudicial and cumulative of matters already irrefutably established
     in evidence.  In People v. Cardenas, supra, 31 Cal.3d 897, the supreme
24   court held this rule applies to gang membership evidence which is
     cumulative.  "[T]he prosecution has no right to present cumulative
25   evidence which creates a substantial danger of under prejudice to the
     defendant." (People v. Cardenas, supra, 31 Cal.3d 897, 905; See also
26   People v. Sanchez, 58 Cal.App.4th 1435, 1449 (1997) ["Evidence of gang

                                        30

1  membership [may be] admitted to show bias, *provided it is not cumulative to other properly admitted and less inflammatory evidence." (italics added)*]]).  Here, all three defendants admitted membership in IVB by way of stipulation which the prosecution accepted.  (RT 742.).  The prosecution could not justify the gang expert as necessary to establish membership at trial where such basis for the testimony would be cumulative to the accepted stipulation.

2

3

4

5  Petitioner limits his argument to the gang expert's testimony and does not argue that the letters

6  were more prejudicial than probative, even though he apparently raised that argument on appeal.

7  As to whether prejudice outweighed probative value, the Court of Appeal stated:

8  Tran next contends the trial court abused its discretion in not excluding the gang expert's testimony under Evidence Code section 352.  We disagree.

9

10  * * *

11  Here, the evidence of "gang mentality" was highly relevant to prove not only the elements of the gang enhancement, but also defendants' motive for the shooting, which in turn was relevant to prove both their identity as the perpetrators and the intent with which they acted.  Contrary to defendants' contentions, the expert's testimony was not used simply "to criminalize an activity that members or associates of gangs may engage in or to supply elements of mental state simply based on gang membership."  Instead, the gang expert's testimony was used to help the jury understand why, based on a minor altercation inside Hot Shots, defendants would have returned to the poolhall only moments later and fire a gun at people standing outside with the intent to kill someone standing there.

12

13

14

15

16  Given its significant probative value, we cannot find the trial court acted in an arbitrary, capricious, or patently absurd manner in concluding the gang expert's testimony should be admitted despite its potential prejudicial effect.  Moreover, the fact that defendant admitted their membership in IVB did not make the expert's testimony so cumulative as to outweigh its probative value.  While that admission lightened the prosecution's burden in some respects, it did not cover all the aspects of the gang enhancement, nor was it coextensive with the gang expert's testimony about the "gang mentality," which, as we have noted, was highly probative evidence of the defendants' motive for the shooting.

17

18

19

20

21

22  Petitioner's argument is based on the notion that the stipulation that he and Vo were members of

23  IVB rendered the gang expert testimony cumulative and, therefore, inadmissible under California

24  law.  However, while he states that the testimony was "highly prejudicial," petitioner does not

25  indicate how the gang expert's testimony created any danger of undue prejudice substantially

26  outweighing the testimony's probative value.  The court notes that all evidence against a criminal

1   defendant is "highly prejudicial" in that it has the potential to establish guilt, but this does not

2   necessarily mean that all evidence is unduly prejudicial or that its prejudice substantially

3   outweighs probative value.  California law only precludes unduly prejudicial evidence and

4   petitioner has not met his burden of showing that the gang expert's testimony was unduly

5   prejudicial such that its admission violated notions of fundamental fairness.  As to whether the

6   evidence was cumulative, the court agrees with the Court of Appeal that the stipulation did not

7   establish every element of the prosecution's case such that the gang expert's testimony was

8   unnecessary.  Specifically, petitioner only stipulated that he was a member of a street gang, but

9   did not stipulate that he acted "for the benefit of, at the direction of, or in association with any

10  criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct

11  by gang members."  See Cal. Penal Code § 186.22.  Therefore, the state court's determination

12  was neither contrary to nor an unreasonable application of the law.

13              5.      Hearsay

14              Petitioner contends that the letters constituted inadmissible hearsay evidence that

15  the reversal is warranted under Crawford v. Washington, 541 U.S. 36 (2001).  The Confrontation

16  Clause protects a defendant from unreliable hearsay evidence being presented against him during

17  trial.  See U.S. Constitution, Amendment VI.  Prior to the Supreme Court's decision in Crawford,

18  the admission of hearsay evidence did not violate the Confrontation Clause where the hearsay fell

19  within a firmly rooted exception to the hearsay rule or otherwise contained "particularized

20  guarantees of trustworthiness."  Lilly v. Virginia, 527 U.S. 116, 123-24 (1999); Ohio v. Roberts,

21  448 U.S. 56, 66 (1980).  In Crawford, however, the Supreme Court announced a new rule:  Out-

22  of-court statements by witnesses not appearing at trial that are testimonial are barred under the

23  Confrontation Clause unless the witnesses are unavailable and the defendant had a chance to

24  cross-examine, regardless of whether such statements are deemed reliable by the trial court.  See

25  541 U.S. at 51.  If error occurred, the next question is whether such error was harmless.

26  See Bockting v. Bayer, 399 F.3d 1010, 1022 (9th Cir. 2005) (applying harmless error analysis).

1      While the Supreme Court in <u>Crawford</u> "le[ft] for another day any effort to spell

2  out a comprehensive definition of 'testimonial,'" the Court provided some guidance. 541 U.S. at

3  68.  The Court observed that "[a]n accuser who makes a formal statement to government officers

4  bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."

5  <u>Id.</u> at 51; <u>see also</u> <u>Davis v. Washington</u>, 547 U.S. 813 (2006) (holding that law enforcement

6  interrogations directed at establishing the facts of a past crime or in order to identify the

7  perpetrator are testimonial).

8      At the outset, the court finds that the letters were not hearsay because they were

9  not offered to prove the facts of the matters stated, and the trial court instructed the jury that they

10  could not be considered as to the truth of anything stated in the letters.[7]  Moreover, even if the

11  letters were hearsay, their admission was not barred by <u>Crawford</u> because they were not

12  testimonial in nature.  Specifically, the letters were not statements to law enforcement given in

13  the course of a criminal investigation.  The letters are more akin to "casual remarks to an

14  acquaintance."  <u>See</u> <u>Crawford</u>, 541 U.S. at 51.  The state court's rejection of petitioner's hearsay

15  claim was neither contrary to nor an unreasonable application of <u>Crawford</u>.

16          6.    <u>Aider and Abettor Liability</u>

17      Petitioner claims that his due process rights were violated when the state court

18  allowed the gang expert testimony to be used as the only evidence that he aided and abetted Vo.

19  As to this claim, the Court of Appeal stated:

20          Relying on cases from the Ninth Circuit, . . . Tran contends it was
           "improper to establish 'aider and abettor' liability through gang expert
21          testimony."

22

23      [7]    The state court observed:

24          Here, during the gang expert's testimony the court instructed the
           jury that the letters were "not offered to prove something specific
25          happened," but for the "limited purpose" of "lay[ing] some foundation for
           the expert's view or the expert's opinion on . . . the attitude towards gangs
26          that may be displayed in a given portion of a letter."

1
2
3
4
5
6
7
8

       Neither of the cases on which defendants rely – *Mitchell v. Prunty* (9th Cir. 1997) 107 F.3d 1337, and *U.S. v. Garcia* (9th Cir. 1998) 151 F.3d 1243 – dealt with the admissibility of gang expert evidence.  Rather, they dealt with the sufficiency of gang membership evidence to prove either aiding and abetting or conspiracy.  In *Mitchell,* the court found there was "a massive failure of proof that [the defendant] aided and abetted [the victim's] killing" and that failure could not be remedied by the argument that the defendant "aided and abetted the killing by fanning the fires of gang warfare that culminated in [the victim's] death."  (citation omitted).  According to the court, "[m]embership in a gang cannot serve as proof of intent, or of the facilitation, advice, aid, promotion, encouragement, or instigation needed to establish aiding and abetting."  (citation omitted).  Following *Mitchell*, the court in *Garcia* held that "evidence of gang membership cannot itself prove that an individual has entered a criminal agreement to attack members of rival gangs."  (citation omitted).

9
10
11
12

       Neither *Mitchell* nor *Garcia* is of assistance to defendants here because evidence of their membership in IVB was far from the only evidence of intent or aiding and abetting liability.  Likewise the gang expert's testimony about 'gang mentality' was not the only evidence that defendants committed the drive-by shooting at Hot Shots with the intent to kill someone.  As the People point out, "[i]t is patent that [Vo] was not convicted on generic evidence about gang membership."  The same is true of Tran.  Accordingly, *Mitchell* and *Garcia* are inapplicable.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

       The factual premise of petitioner's claim is flawed in that he claims that the gang expert's testimony was the <u>only</u> evidence that he aided and abetted Vo.  As the state court outlined in its summary of the facts, which petitioner does not refute with clear and convincing evidence to the contrary, he and Vo were members of the IVB street gang.  Both were present on April 10, 1998, at the Hot Shots billiards parlor.  At the poolhall, there was a confrontation with the rival ECC street gang and, during this confrontation, members of IVB were challenged when an ECC member said "fuck IVB."  As petitioner and Vo were leaving, an ECC member taunted them further.  Following all this, petitioner and Vo returned to the poolhall with the headlights off.  As petitioner drove by the poolhall, Vo fired shots out the car window.  All these facts constitute evidence over and above the expert's testimony upon which the jury could have concluded that petitioner aided and abetted Vo in the commission of the crimes.  There simply could have been no due process violation by admission of the gang expert testimony to show aiding and abetting where there was so much other evidence of petitioner's culpability.  The state court's analysis was neither contrary to nor an unreasonable application of the law.

1          **D.     Prosecutorial Misconduct**

2          Success on a claim of prosecutorial misconduct requires a showing that the

3   conduct so infected the trial with unfairness as to make the resulting conviction a denial of due

4   process.  See Greer v. Miller, 483 U.S. 756, 765 (1987).  The conduct must be examined to

5   determine "whether, considered in the context of the entire trial, that conduct appears likely to

6   have affected the jury's discharge of its duty to judge the evidence fairly."  United States v.

7   Simtob, 901 F.2d 799, 806 (9th Cir. 1990).   Even if an error of constitutional magnitude is

8   determined, such error is considered harmless if the court, after reviewing the entire trial record,

9   concludes that the alleged error did not have a "substantial and injurious effect or influence in

10  determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).  Error is

11  deemed harmless unless it "is of such a character that its natural effect is to prejudice a litigant's

12  substantial rights."  Kotteakos v. United States, 328 U.S. 750, 760-761 (1946).  Depending on

13  the case, a prompt and effective admonishment of counsel or curative instruction from the trial

14  judge may effectively "neutralize the damage" from the prosecutor's error.  United States v.

15  Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1993) (citing Simtob, 901 F.2d at  806).

16          Petitioner argues:

17          During closing argument, the District Attorney advised the jury
    that defense counsel was wrong in his description of reasonable doubt. He
18  exhorted the jury to reject defense counsel's descriptions of reasonable
    doubt and embrace an improper standard: "What's reasonable doubt?
19  Reasonable doubt is nothing more than common sense. That's all that it
    is." (RT 2049-2050).  Defense counsel immediately objected to this
20  characterization, yet the trial court merely advised the jury that the District
    Attorney could "paraphrase" reasonable doubt in his own words and
21  referred the jury to the jury instruction. (RT 2050).  Clearly the court
    should have advised the jury that reasonable doubt is a very high standard
22  and "common sense" judgments do not meet the standard.
            The high court has addressed the dilution of the reasonable doubt
23  standard and has made clear that misinstruction on this critical standard
    violates a criminal defendant's Sixth Amendment jury trial right and
24  compels a finding of prejudice. (Sullivan v. Louisiana, 508 U.S. 275
    (1993)).  As a unanimous court in Sullivan explained, the Due Process
25  right to a finding of guilt beyond a reasonable doubt and the Sixth
    Amendment jury trial right, are "interrelated." (Id. at 278.).  "[T]he jury
26  verdict required by the Sixth Amendment is a jury verdict of guilty beyond

1    a reasonable doubt." (*Ibid.*).

2            Both Federal and California courts have stressed that a prosecutor's equation of reasonable doubt with common sense is improper and offensive to the constitutionally requisite standard of proof. Petitioner

3    contended on appeal and reasserts in this petition that the court's admonition to the jury approved of the prosecutor's misassignment of the

4    correct burden. When defense counsel objected insisting that reasonable doubt was not a "gut feeling," the court did not tell the jury that "common

5    sense" was far too low a burden. Instead, the court advised the jury that, "Each side interprets it or paraphrases it in different fashions." In doing

6    so, the court erroneously approved of the prosecutor's "paraphrase" of reasonable doubt which dramatically reduced the burden of proof. The

7    court's acquiescence to the prosecutor's statement by describing it as a "paraphrase," particularly in light of the vocalized defense objection,

8    exacerbated the prejudice caused by the prosecutor's misconduct. The prosecutor's argument was the last substantive description of the burden of

9    proof that the jury heard prior to beginning deliberations. The prosecutor started by telling the jury that the defense version of reasonable doubt was

10   wrong and then went on to explicitly redefine the term giving a lessened standard for reasonable doubt. This egregious error denied appellant a fair

11   trial.

12   Petitioner concludes that the prosecutor's "paraphrasing" of the reasonable doubt standard as one

13   based on common sense affected the jury's duty to fairly and properly judge the evidence.

14           As to this claim, the state court began by providing a more detailed summary of

15   the background than that offered by petitioner. First, the state court described the prosecutor's

16   statement as follows:

17           At the very end of rebuttal argument, the prosecutor addressed the burden of proof beyond a reasonable doubt. After rereading the instruction

18   defining reasonable doubt, the prosecutor stated as follows: "So what does this mean? What's reasonable doubt? Reasonable doubt is no more than

19   common sense. That's all it is. That's all reasonable doubt is. [¶] I'll break this instruction down for you a bit further. It basically says if you

20   have any doubt based on reason, any doubt based on reason after the comparison and consideration of all the evidence – any doubt based on

21   reason after the entire comparison and consideration of all the evidence, the defendants are not guilty. Any doubt based on reason. That's all.

22   After comparing the evidence, all the evidence, the defendants are not guilty. Reason. Common sense. That's all it is. [¶] I'm going to break it

23   down to you even further. After hearing all the evidence, . . . you think to yourself they did it, you know they did it, that's it. Reasonable doubt.

24   You knew they did it, standard is met. You know they did it."

25   / / /

26   / / /

The state court then summarized trial counsel's objection and the court's response:

> At that point, Vo's counsel objected: "That is not reasonable doubt. That is not just if you have a gut feeling somebody did it. There has to be evidence. It has to be proof beyond a reasonable doubt." The court responded: "All right. I think we've discussed reasonable doubt enough and the jurors have the wording in front of them. Each side interprets it or paraphrases it in different fashions. The jurors are to follow the legal definition of reasonable doubt."

Assuming without deciding that the prosecutor's comment improperly misstated the reasonable doubt standard, the Court of Appeal found that any error was harmless:

> . . . Even assuming, however, that the prosecutor's equation of the reasonable doubt standard with "common sense" and "think[ing] to yourself they did it, you know they did it" amounted to a misstatement of the law, any potential harm from the misstatement was cured by the trial court's immediate admonition to the jurors that they were "to follow the legal definition of reasonable doubt," the wording of which they had "in front of them," and which, we hasten [to] add, the prosecutor had just read to them. . . . Under the circumstances of this case, no further curative instruction or admonition was necessary.

The record reflects that the trial court gave the following instruction on reasonable doubt:

> Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all the evidence leave the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.

Petitioner does not argue that this instruction misstated the reasonable doubt standard. Comparing this language to the prosecutor's statement, this court is not certain that the prosecutor misstated the standard. Specifically, the trial court defined reasonable doubt as the state of the case where a juror does not feel an "abiding conviction" of guilt. It is also not mere possible doubt. Not inconsistent with this definition, the prosecutor said reasonable doubt was "[a]ny doubt based on reason." The prosecutor also said guilt was established when the jury "knew they did it." This is not inconsistent with the "abiding conviction" language in the instruction. The prosecutor never used the words "gut feeling."

1    Even assuming, as the state court did, that the prosecutor did in fact misstate the

2   standard, this court agrees that any error was harmless.  As outlined above, the trial court

3   properly instructed the jury on the reasonable doubt standard, and petitioner does not challenge

4   that instruction here.  Prior to the prosecutor's discussion of the standard, he read the actual

5   instruction.  Further, following counsel's objection at trial, the court admonished the jury to

6   follow the definition set forth in the instruction.  The instruction and admonition cured any

7   possibility of the jury having applied anything less than the reasonable doubt standard.

8    Petitioner argues that the error – assuming error occurred – was not harmless

9   because at least two jurors indicated to him following the trial that they based their verdict on

10   "the preponderance of the evidence."  In a declaration submitted to the trial court in support of a

11   motion for a new trial, counsel stated that, in his opinion, this statement from the jurors he

12   questioned indicated to him that "these two jurors, at least, were confused as to the standard of

13   proof required in this case."[8]  In considering the motion for a new trial at the time of sentencing,

14   the following exchange occurred:

15    THE COURT:  Well, it appears the People make a valid objection
    to your declaration.  There is very limited, strict rules about how you delve
16   into the jury deliberation process and jurors' misunderstandings, and that
    needs to be followed.
17    Now, you can say, well, we can always bring that up.  Well, you
    know, this case is about, what, three and a half months since the verdict
18   came in, so if one is going to start working on that, it should have been
    worked on earlier.
19    I'm not saying the law may preclude you at some point of trying to
    go into that, but it would seem to me the proper time to go into it is before
20   the sentence has been imposed in this case, and the Court has granted
    ample time for the preparation of such motion.
21    So, I believe that the People's objection to the declarations are
    justified and appropriate.
22
    * * *
23
    THE COURT:  All right.  Well, I do not feel that the argument of
24   [the prosecutor] was improper. . . .  [¶] Just in passing comment, . . . I
    don't think one can draw – in case one wants to explore this, or intends
25

26    [8]    Respondent does not address this argument in his answer.

    38

1    to – I don't think one can draw from the comment of the juror, one juror,
     saying, what made you decide and he said it was the preponderance of the
2    evidence.
            I mean, this case – we never defined – I doubt we defined for these
3    jurors what preponderance of the evidence was.  Defining and talking
     about what exactly preponderance of the evidence meant in this case was
4    not a focus of this trial.
            So I interpret that as somebody's phrase like – such as he wanted to
5    draft a bigger word rather than a smaller word, but the strength of the
     evidence, not that he was applying the preponderance definition, rather
6    than proof beyond a reasonable doubt.
            So I would not, from that comment, reach some conclusion that
7    that juror truly was applying the preponderance of the evidence.  We know
     what that means, but the common-sense people on the streets, they don't
8    know what that means.
            So, I certainly don't think that establishes at all, or even creates a
9    likelihood, that the jury was functioning on a preponderance of the
     evidence.
10           From voir dire on, this Court has emphasized to the jurors in this
     case the importance of proof beyond a reasonable doubt and the
11   presumption of innocence and those issues.  I take some conscientious
     duty to see that jurors are imbued with that in jury selection and certainly
12   in argument and certainly in jury instructions, they were properly advised
     of the law.
13           So I just can't believe that someone walked out that door and
     thought, yeah, we are applying the preponderance of the evidence test in
14   this case, was it more likely than not?

15   This court agrees with the trial court's analysis.  First, petitioner has failed to provide the jurors'

16   declarations as to the standard of proof they believed applied in this case.  In particular, there are

17   no juror declarations indicating that the jury applied anything less than the reasonable doubt

18   standard, as instructed at trial.  Second, given the trial court's repeated emphasis on the correct

19   criminal proof standard, the more reasonable interpretation of the juror's purported comment to

20   counsel was that the juror misused the phrase "preponderance of the evidence" to mean that,

21   under the correct standard of reasonable doubt, the juror found the defendants guilty.  As the trial

22   court observed, the preponderance standard is a technical term of art with which most people are

23   not familiar and there is no indication in the record that this standard was ever explained to the

24   jury in this case.

25   / / /

26   / / /

                                              39

1    For these reasons, the court cannot say that the state court's disposition of

2  petitioner's prosecutorial misconduct claim was either contrary to or an unreasonable application

3  of clearly established law.

4    **E.**    **Cruel and Unusual Punishment**

5    Petitioner's argument, in its entirety, is as follows:

6    There was little evidence as to petitioner's state of mind at the time
    of the Hot Shots shooting.  Even despite the jury's verdicts, his actual
7    involvement remains unclear.  The jury certainly found that petitioner was
    the driver of the shooter's vehicle, but no information was presented as to
8    what was discussed in the car just prior to the shooting, and there was no
    evidence of petitioner's role.  As was demonstrated above . . . ., the
9    evidence of petitioner's knowledge of co-defendant Vo's criminal purpose
    was not demonstrated by any admission or stated threat.  It is equally clear
10    from the evidence that petitioner was not the actual shooter.  His liability
    resulted from a finding that he was an aider and abettor to the actual
11    shooter.

12  Petitioner concludes that his sentence is "disproportionate to his role in aiding and abetting . . .

13  Vo" and, therefore, violates the Eighth Amendment.  Respondent argues the claim is

14  procedurally barred because counsel failed to make a contemporaneous objection at the time of

15  the sentencing hearing.  Respondent also addresses the claim on its merits.

16    1.    Procedural Bar

17    Based on concerns of comity and federalism, federal courts will not review a

18  habeas petitioner's claims if the state court decision denying relief relies on a state law ground

19  that is independent of federal law and adequate to support the judgment.  See Coleman v.

20  Thompson, 501 U.S. 722 (1991); Harris v. Reed, 489 U.S. 255, 260-62 (1989).  However, a

21  discretionary state rule is not adequate to bar federal habeas corpus review.  See Siripongs v.

22  Calderon, 35 F.3d 1308 (9th Cir. 1994).  Generally, the only state law grounds meeting these

23  requirements are state procedural rules.  Even if there is an independent and adequate state

24  ground for the decision, the federal court may still consider the claim if the petitioner can

25  demonstrate:  (1) cause for the default and actual prejudice resulting from the alleged violation of

26  federal law, or (2) a fundamental miscarriage of justice.  See Harris, 489 U.S. at 262 (citing

1   Murray v. Carrier, 477 U.S. 478, 485, 495 (1986)).

2          A state law is independent if it is not interwoven with federal law.  See Michigan

3   v. Long, 463 U.S. 1032, 1040-41 (1983).  The independence of a state law is measured at the

4   time the default is imposed by the state court to bar a claim.  See Bennett v. Mueller, 322 F.3d

5   573, 582 (9th Cir. 2003); see also La Crosse v. Kernan, 244 F.3d 702, 204 (9th Cir. 2001); Park

6   v. California, 202 F.3d 1146 (9th Cir. 2000) (assessing whether California's waiver default was

7   independent when the California Supreme Court denied the claim).  A state law is adequate if it

8   is clear, well-established, and consistently applied.  See Bargas v. Burns, 179 F.3d 1207, 1211

9   (9th Cir. 1999).  The adequacy of a state default is measured at the time of the petitioner's

10  purported default.  See Fields v. Calderon, 125 F.3d 757, 760 (9th Cir. 1997).  Thus, the

11  respective dates for determining the adequacy and independence may not be the same.

12         The government bears the ultimate burden of establishing adequacy.  See Bennett,

13  322 F.3d at 581.  However, because the petitioner bears the initial burden of putting a procedural

14  bar affirmative defense in issue in the case (by asserting specific factual allegations as to

15  inadequacy, for example), the scope of the state's burden of proof is measured by the specific

16  assertions put forth by petitioner.  See id. at 586.  The petitioner's burden is de minimus.  See

17  King v. Lamarque, 464 F.3d 963, 967 (9th Cir. 2006); see also See Webb v. Kernan, 2008 WL

18  564965 (E.D. Cal. 2008).

19         When the state court discusses a procedural default but also reaches the merits of

20  a claim, a denial of the claim cannot be said to have relied on the procedural default.  See

21  Thomas v. Hubbard, 273 F.3d 1164, 1176 (9th Cir. 2001) (citing Harris, 489 U.S. at 263); see

22  also Panther v. Hames, 991 F.2d 576, 580 (9th Cir. 1993).  As the Ninth Circuit observed in

23  Panther, ". . . because the Alaska Court of Appeals considered Panther's claim on the merits . . .

24  so can we."  991 F.2d at 580.  In Thomas, the state court discussed the issue of procedural default

25  but then went on to deny the claim because any error was harmless.  See 273 F.3d at 1176.  The

26  Ninth Circuit held: "In doing so, the [state] court left the resolution of the procedural default

1   issue uncertain rather than making a clear and express statement that its decision was based on a

2   procedural default."  Id.  Therefore, where the state court discusses both procedural default and

3   the merits, and does not expressly hold that the procedural default is the basis of the denial, the

4   procedural default does not operate to bar federal review.

5           Under California law, ". . . an appellate court will not consider claims of error that

6   could have been – but were not – raised in the trial court."  People v. Vera, 15 Cal.4th 269, 275-

7   76 (1997).  In Rich v. Calderon, 187 F.3d 1064, 1066 (9th Cir. 1999), and Vansickel v. White,

8   166 F.3d 953 (9th Cir. 1997), the Ninth Circuit held that California's contemporaneous objection

9   rule is an adequate and independent state procedural rule when properly invoked by the state

10  courts.  The Ninth Circuit has also concluded that the contemporaneous objection rule has been

11  consistently applied by the California courts.  See Melendez v. Pliler, 288 F.3d 1120, 1125 (9th

12  Cir. 2002).

13          In this case, the Court of Appeal mentioned the contemporaneous objection rule

14  as follows:  "As it appears defendant failed to raise this issue in the trial court, it is waived.

15  (citations omitted)."  However, the court then stated:  "Nonetheless . . . we shall address – and

16  reject – this argument on its merits."  The state court then discussed the merits of petitioner's

17  Eighth Amendment claim.  Because the state court addressed the merits, this court cannot say

18  that the state court's denial of this claim necessarily relied on a state procedural default.

19  Therefore, federal review of the claim is not barred.

20          2.      The Merits

21          As the Court of Appeal notes, the United States Supreme Court addressed

22  proportionality in the context of non-capital sentences in Ewing v. California, 538 U.S. 11

23  (2003), and Lockyer v. Andrade, 538 U.S. 63 (2003).  In Ewing, a non-capital case, a five-justice

24  majority concluded the defendant's sentence did not violate the Eighth Amendment, but only

25  three justices – O'Connor, Rehnquist, and Kennedy – reached this conclusion by applying a

26  proportionality test.  See Ewing, 538 U.S. at 20-24.  In Andrade, the Court applied AEDPA

1  review standards and concluded that its precedent for determining whether term-of-years

2  sentences violate the Eighth Amendment are unclear and, for this reason, federal habeas relief

3  was not available.  See Andrade, 538 U.S. 71-74.

4          The Court of Appeal concluded that the sentence did not violate the limited

5  proportionality principle articulated by a majority of the justices in these cases:

6          Here, Tran was punished with a term of life without the possibility
        of parole, and a consecutive term of 25 years to life in prison, for being the
7        driver in an intentional, drive-by shooting murder.  That Tran did not
        personally use a gun in the commission of the offense does not lessen his
8        culpability.  As the driver, he brought Vo back to Hot Shots and thereby
        made the shooting possible.  In addition, the evidence showed that in
9        facilitating the drive-by shooting, Tran was acting as part of, and for the
        benefit of, a criminal street gang.  The Legislature has determined that
10       under such circumstances, a person who aids and abets a gang shooting
        should receive the same penalty enhancement as the one who pulled the
11       trigger.
          Given the seriousness of Tran's crime, even his relative
12       youth and limited criminal record does not make his case one of
        those exceedingly rare cases where the punishment is so grossly
13       disproportionate that i[t] shocks the conscience and offends
        fundamental notions of human dignity.  More offensive to such
14       notions than Tran's sentence are the actions for which he was
        sentenced, by which a human life was cruelly extinguished.
15          Viewing the nature of the crime, the nature of the criminal, and the
        statutory directive regarding the appropriate sentence, we find no
16       constitutional disproportionality in Trans's sentence.

17  Because this case is controlled by AEDPA, this court must follow the Supreme Court's decision

18  in Andrade and conclude that there is no clearly established law and, therefore, that habeas relief

19  is unavailable on this claim.  Even assuming the limited proportionality principle outlined in

20  Ewing represents clearly established Supreme Court precedent, this court finds that the state

21  court's denial of petitioner's Eighth Amendment claim was not an unreasonable application of

22  that principle.  Given petitioner's role in the crime, which the California legislature has said is a

23  serious offense due to street gang involvement, this court cannot say that petitioner's sentence

24  shocks the conscience.

25  / / /

26  / / /

1

**IV.  CONCLUSION**

2        Based on the foregoing, IT IS HEREBY ORDERED that:

3        1.      Petitioner's petition for a writ of habeas corpus (Doc. 1) is denied; and

4        2.      The Clerk of the Court is directed to enter judgment and close this file.

5

6  DATED: April 21, 2008

7

8                        **CRAIG M. KELLISON**
                          UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26